IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAYNARD DUBLUNCH PORCHE,<br><br>Defendant. | CR 22–08–BLG–DLC<br><br><br><br>ORDER |

Before the Court is Defendant Raynard Dublunch Porche's suppression motion. (Doc. 16.) Porche argues law enforcement lacked reasonable suspicion to detain him during an encounter in Lodge Grass, Montana on October 7, 2021, and, therefore, the firearm uncovered from his person during that encounter should be suppressed. (*See generally* Doc. 17.) For the reasons stated herein, the Court will grant the motion.

## FACTUAL BACKGROUND[1]

Camden Wilson is a Bureau of Indian Affairs police officer assigned to the Crow Indian Reservation in southern Montana. Officer Wilson generally spends

---

[1] This factual background is derived from all relevant filings and the evidence received during the suppression hearing. To the extent any "factual issues are involved in deciding" the pending motions, this background constitutes the Court's "essential findings" of fact. *See* Fed. R. Crim. P. 12(d).

1

his shift patrolling the town of Lodge Grass, which based on his several years of experience, tends to be a high crime area. That is, based on Officer's Wilson's own experience as a police officer and the experiences of his fellow officers, he knows Lodge Grass to suffer from high rates of drug distribution, assaults, stolen vehicles, home break-ins, and domestic disputes.

In the early morning hours of October 7, 2021 Officer Wilson was patrolling the town of Lodge Grass. At around 12:18 a.m. he noticed that a van was parked at White Arm Park with its hazard lights on. White Arm Park is a public area within the town of Lodge Grass. It contains a public restroom and some playground equipment but is mainly used as a cut-across by local residents. Officer Wilson was aware people sometimes used the restroom for illegal drug activity. Officer Wilson decided to check the situation out. He pulled his patrol vehicle behind the van and illuminated his white overhead lights to better see what was going on. With the way Officer Wilson parked, the van was not totally blocked in but would have to turn around to leave through the narrow gap left in the park entrance.

Upon arrival, Officer Wilson noticed that the van had Sheridan, Wyoming plates and standing next to it, was Jennifer Gardner, a known drug user. Officer Wilson began chatting with Gardner, and, shortly thereafter, Porche stepped out of the park's restroom. Officer Wilson asked them what they were doing at the park

and they both responded that Wilson was giving Gardner a ride across town from Pete Schenderline's house to her sister's house. Before this interaction, Officer Wilson suspected Schenderline of being involved in both vehicle theft and illicit drug activity.

    Officer Wilson asked where Gardner's sister's house was and was told it was just across the street—about 20 yards away. At this point, Officer Wilson became suspicious something nefarious was going on. For one, he found it odd that Porche would not have just used the restroom at either Schenderline's house or Gardner's sister's residence, because both were just a short distance across town from each other. Further, it was just after midnight, and Porche and Gardner (who, again, is known to Officer Wilson as a drug user) were at a park known for illegal drug activity. Officer Wilson asked Porche for his identification and he produced an Idaho driver's license. Officer Wilson would keep Porche's identification for the duration of the encounter. Officer Wilson also found out Porche had been in town for about three weeks. This surprised Officer Wilson because Lodge Grass is a small community, which he had frequently patrolled during that period, and he had never seen Porche's van before.

    This intensified Officer Wilson's inclination that he was being lied to because he is always on the lookout for vehicles with Sheridan Wyoming plates (which Porche's van had), given the frequency with which stolen vehicles from

3

that area are brought onto the reservation.  In other words, if Porche had really been in town for three weeks, Officer Wilson found it extremely unlikely he would not have already encountered his van and at least run its plates to ensure it was not stolen.  Officer Wilson also observed that Porche and Gardner did not seem comfortable together and stood several feet apart from one another throughout the encounter.   At this point, Officer Wilson decided to pull Gardner aside.

Once away from Porche, Gardner quickly changed her story to state she did not know Porche and he was not actually giving her a ride anywhere.  Officer Wilson decided to pat her down, which revealed a marijuana pipe.  He returned it to her and told her to go to her sister's residence across the street.  Officer Wilson then turned his attention back to Porche.  The two began chatting again, with Officer Wilson continuing to ask him what he was doing on the reservation and how long he had been there.  The parties spoke freely and Porche was permitted to walk around his vehicle and even open up the passenger side door to the van at one point.  Officer Wilson asked Porche why he had an Idaho driver's license and Wyoming plates, and Porche told him had recently moved to Wyoming from Idaho.  Eventually, the conversation reached a point where Officer Wilson was going to confront Porche about the inconsistencies between his and Gardner's stories.

Because he thought doing so might move the encounter in a tenser direction,

he decided he wanted to pat Porche down for weapons first.  When he told Porche he was going to pat him down, Porche recoiled and pulled away from Officer Wilson.  Officer Wilson told him a second time he was going to pat him down, and, although Porche again recoiled, he subsequently pointed at his right waistband and told Officer Wilson he had a gun.  Officer Wilson retrieved the firearm, which was loaded, from Porche's person.  Officer Wilson ran the firearm through a database and found out it was stolen.  Porche admitted he was a felon.  As such, and because Porche was a non-indian, a Big Horn County Sheriff was dispatched to the scene around 12:48 a.m., and arrived there at around 1:22 a.m., after which Porche was taken into custody.

## PROCEDURAL BACKGROUND

On January 20, 2022, Porche was indicted on one count of being a prohibited person in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  (Doc. 2.)  Porche subsequently filed the instant suppression motion.  (Doc. 16.)  The Court held a hearing on June 27, 2022.  (Doc. 23.)  During this hearing, Officer Wilson testified, and the Court heard argument from the parties.  (*Id.*)  Having reviewed the evidence and arguments submitted in this matter, the Court finds Porche's Fourth Amendment rights were violated, and, as such suppression of the firearm is proper.

ANALYSIS

Porche's motion requires the Court to determine whether he was unreasonably searched or seized by Officer Wilson at any point during their October 7, 2021 encounter. This is admittedly a close question, but before addressing it, the Court must resolve a threshold issue.

### I. ICRA is Inapplicable.

In his opening brief, Porche cites to the Indian Civil Rights Act, apparently asserting that this federal enactment governs whether suppression is proper in this case. (Doc. 17 at 9.) Put another way, it appears Porche is contending suppression is proper, not because of a Fourth Amendment violation, but because of an ICRA violation. But the Court finds ICRA inapplicable. The encounter between Officer Wilson and Porche occurred in Indian country, *see* 18 U.S.C. § 1151, a fact that upon cursory examination may raise the difficult questions attendant to the exercise of tribal law enforcement authority over non-indians. *See, e.g., United States v. Cooley*, ___ U.S. ___, ___, 141 S. Ct. 1638, 1641–46 (2021). Ultimately, however, such questions are not at issue in this case.

Officer Wilson is a BIA employee "charge[d] . . . with law enforcement responsibilities," in Indian country, pursuant to federal law. *See* 25 U.S.C. § 2803; *see also Wilson v. Horton's Towing*, 906 F.3d 773, 782 (9th Cir. 2018). In other words, he is a *federal* law enforcement officer, not a *tribal* one. Tribal law

enforcement agencies generally arise through self-determination contracts entered between an Indian tribe and the United States.  *See* 25 U.S.C. §§ 5304(j), 5321; *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012); *Wilson*, 906 F.3d at 783.  It does not appear the Crow Tribe of Montana was operating its own police force under such a contract at the time the encounter at issue occurred, and policing services were furnished by the BIA.[2]

Really then, this case does not involve the exercise of *tribal* authority.  It involves the exercise of *federal* authority.  25 U.S.C. §§ 2801(7), 2803(3) (authorizing BIA employees to make arrests in Indian country for certain *federal* offenses).  This renders ICRA inapplicable.  25 U.S.C. § 1302(a) (limiting its reach to the action of an "*Indian tribe* . . . exercising the powers of self-government") (emphasis added); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) (ICRA curtails tribal authority).   Put another way, the encounter between Officer Wilson and Porche constituted an encounter between a federal law enforcement officer and a United States' citizen in a federal enclave.  18 U.S.C. § 1152; *United States v. Begay*, 42 F.3d 486, 498 (9th Cir. 1994).  The Constitution, not ICRA, is the metric by which the validity of Officer Wilson's actions must be assessed.  *See United*

---

[2] The Court must point out this is not for want of trying and the Crow Tribe is engaged in persistent and diligent efforts to establish and maintain their own police force. *Insecure: The Rise and Fall of the Crow Nation Police Department*, NATIVE NEWS, https://nativenews.jour.umt.edu /projects/2021-home/insecure/ (last visited July 21, 2022).  Congress itself recognizes doing so furthers the promise of tribal self-government. *See* 25 U.S.C. §§ 5301, 5302.

*States v. Christie*, 717 F.3d 1156, 1161–63 (10th Cir. 2013) (engaging in Fourth Amendment suppression analysis to charges arising from federal investigation in federal enclave).  Consequently, the Court focuses its analysis there—asking whether Officer Wilson violated Porche's Fourth Amendment rights on October 7, 2021.

    **II.    At some point, Officer Wilson's Encounter with Porche Ripened into a *Terry* Stop.**

The Court agrees with the parties that the best analytical approach in this case is to move from the beginning of the encounter onward, discussing the applicable law along the way.  Recall the encounter in this case began just after midnight on October 7, 2021 when Officer Wilson noticed a van parked at a public park with its hazard lights on and decided to make contact.  At this point at least, the United States contends, the Fourth Amendment was not even implicated because Officer Wilson was acting as a community caretaker.  (Doc. 21 at 7–8.) The Court is willing to accept the argument at the outset of the encounter, but it cannot be used to justify the encounter for long.

In *Cady v. Dombrowski*, 413 U.S. 433 (1973), the Supreme Court recognized that law enforcement is often called upon to perform "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 442. Relying on this caretaker role, the Supreme Court has upheld the warrantless

inventory search of "disabled or damaged vehicles . . . remove[d] and impound[ed]" by law enforcement because they "jeopardize both the public safety and the efficient movement of vehicular traffic." *South Dakota v. Opperman*, 428 U.S. 364, 370–71 (1976). Since that time, the doctrine has not been readily applied to new contexts—meaning those that do not directly involve the impoundment of an automobile for community caretaking reasons. *See Hallstrom v. City of Garden City*, 991 F.2d 1473, 1477 n.4 (9th Cir. 1993) (removal of vehicle proper); *United States v. Erickson*, 991 F.2d 529, 531–33 (9th Cir. 1993) (search of home pursuant to community caretaking function is constitutionally unreasonable); *Miranda v. City of Cornelius*, 429 F.3d 858, 864–67 (9th Cir. 2005) (community caretaking doctrine did not permit impoundment of car in defendant's driveway); *United States v. Cervantes*, 703 F.3d 1135, 1141–43 (9th Cir. 2012); *Caniglia v. Strom*, ___, U.S. ___, ___, 141 S.Ct. 1596, 1599–1600 (2021). Even if the Court were inclined to extend the community caretaker doctrine outside the vehicle impoundment context, it would not get the United States very far in this case.

As noted above, a police officer acts as a community caretaker when performing some duty separate and apart from "their criminal enforcement activities." *Erickson*, 991 F.3d at 531. Although Officer Wilson testified that when he initially decided to involve himself in the situation at White Arm Park, he wanted to make sure everything was alright, this caretaking function dissipated

9

almost immediately. This is because upon making contact with Gardner, it was apparent there was no emergency at the park—meaning there was no community caretaker role for him to fill. Rather than leaving, Officer Wilson decided to continue investigating.

The parties disagree on whether the continued interaction between Officer Wilson and Porche amounted to a seizure, and, if so, whether Officer Wilson had sufficient cause to effectuate it. Not every interaction between "police and citizens" amounts to a seizure, as far as the Fourth Amendment is concerned. *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984). Questions regarding an individual's "identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. *Id.* 216; *see also Hiibel v. Sixth Judicial Dist. Courts of Nev., Humboldt Cty.*, 542 U.S. 177, 185 (2004). Indeed, the Supreme Court has observed that, without more, "police questioning, by itself, is unlikely to result in a Fourth Amendment violation," because a citizen need only respond if they consent to the interaction. *Delgado*, 466 U.S. at 216.

If "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded," however, then questioning from law enforcement may very well rise to the level of a Fourth Amendment detention, otherwise referred to as an investigatory stop. *Id.* At that point, at a minimum, law enforcement better have

"reasonable suspicion that the person apprehended is committing or has committed a criminal offense," if they want to continue questioning the individual. *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir. 2020) (referring to the so-called *Terry* stop). Even then, "the scope of the detention must be carefully tailored to its underlying justification," *id.* at 938, and the intrusiveness of the stop may very well exceed the justification permitting it to occur in the first place, *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). In fact, even when there is reasonable suspicion for a *Terry* stop, handcuffing the defendant, pointing a gun at him, physically restraining him, or detaining him for an unreasonable length of time, may convert the encounter into an arrest, something law enforcement will need probable cause to justify. *Id.* at 1188–89.

Having concluded the community caretaker doctrine became inapplicable seconds into the encounter, the question becomes whether at any point Officer Wilson's interaction with Porche intensified from a consensual encounter to a formal detention (i.e. investigatory stop). Things certainly appeared to be consensual at first. Porche joined Officer Wilson and Gardner after exiting the park's restroom, shortly after Officer Wilson arrived at the park. Officer Wilson began to ask them some basic questions, mainly focusing on why they were in the park. To be sure, while this was occurring the white overhead lights on Officer Wilson's patrol vehicle were brightly illuminating the area, and the patrol vehicle

11

was parked behind the van in such a manner that Porche probably could have gotten into it and left the park, but he would have had to turn it around and drive through the narrow exit space next to the patrol vehicle.

But Officer Wilson did not display a firearm, nobody was handcuffed or otherwise physically restrained, and the parties appeared to speak freely amongst each other. Officer Wilson learned they were there to use the bathroom, a pitstop on their trip across town to get Gardner to her sister's house. Officer Wilson also learned that Porche had been in town for about three weeks. Officer Wilson also asked for and received Porche's identification. The Court concludes that at this juncture, based on the circumstance's attendant to the encounter, Officer Wilson, Porche, and Gardner were involved in consensual questioning not yet raising any Fourth Amendment implications. *See Delgado*, 466 U.S. at 216–17. Things would change quickly, however.

After obtaining Porche's driver's license, Officer Wilson did not return it. Instead, he decided to pull Gardner aside. Porche, of course, does not have standing, in the Fourth Amendment sense, to challenge the validity of Gardner's continued detention, *see Byrd v. United States*, ___ U.S. ___, ___, 138 S.Ct. 1518, 1530 (2018), but it is not totally irrelevant to Porche's encounter. Specifically, when Officer Wilson pulled Gardner aside, he did not tell Porche he was free to leave, and he kept Porche's driver's license. What was Porche supposed to do—

12

get into his van, effectuate the turn-around maneuver necessary to exit the park through the narrow gap left by Officer Wilson's patrol vehicle, abandoning his driver's license (knowing that the continued operation of a motor vehicle without it may very well violate the traffic code of wherever he went)?

It would not be unreasonable for a person to believe Officer Wilson would have found this behavior suspicious and pursued. Indeed, Officer Wilson testified he may well have pursued if Porche attempted to drive away. Any doubt about whether Porche was being subjected to a *Terry* stop, as opposed to a consensual encounter, evaporated when Officer Wilson spoke privately with Gardner, frisked her, uncovered contraband and then returned it to her and cut her loose, only to continue his questioning of Porche. At that point, Officer Wilson had engaged in extended questioning of both Porche and Gardner, taken and kept Porche's driver's license, pulled Gardner aside for more questioning, frisked her, and cut her lose to return for more questioning of Porche. Based on the totality of the circumstances discussed at length above, no reasonable person would have felt free to leave. Porche was seized. Because of this conclusion, the Court must assess whether, at this point, Officer Wilson had reasonable suspicion that Porche was committing or had committed a criminal offense. *Skinner*, 969 F.3d at 937.

### III. Officer Wilson Had Reasonable Suspicion to Conduct a *Terry* Stop of Porche, but Before Discovering the Gun the Encounter Became Constitutionally Unreasonable.

The reasonable suspicion analysis requires inspection of the "totality of the circumstances to determine whether [Officer Wilson had] a particularized and objective basis for suspecting criminal wrongdoing." *Id.* Importantly, things that "would cast suspicion on large segments of the lawabiding population" and other "innocuous behavior does not justify an investigatory stop unless it is combined with other circumstances that tend cumulatively to indicate criminal activity." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). At this point in the encounter, Officer Wilson knew several things.

He knew, based on his experience, that White Arm Park was an area used for illicit drug activity, including the restroom where Porche was when he arrived. Porche and Gardner were there after midnight. Gardner was a drug user. They stated they were there so Porche could use the restroom when traveling a very short distance across town between two residences. The residence they had come from is occupied by someone known to Officer Wilson to engage in illegal drug activity and car theft. The van had Sheridan, Wyoming plates. Porche's driver's license was from Idaho. Porche claimed to have been in town, a very small community, for three weeks, but Officer Wilson had not seen his vehicle. Gardner had a marijuana pipe on her and changed her story when speaking privately with

14

Officer Wilson. This was consistent with Officer Wilson's observation that Porche and Gardner did not seem to know each other.

The Court finds that at this point—when Officer Wilson cut Gardner loose and returned to continue questioning Porche—he had reasonable suspicion that Porche was engaged in criminal wrongdoing, specifically illegal drug activity. In other words, Officer Wilson reasonably inferred that Porche might be involved in unlawful conduct, because the totality of the circumstances "tend[ed] cumulatively to indicate criminal activity." *Manzo-Jurado*, 457 F.3d at 935. Porche's presence in a park at midnight with a known drug user, after coming from a house known to be involved in drug activity, and entering a public restroom often used for illegal drug activity, provided reasonable suspicion that he was engaged in illegal drug activity. The inconsistent and suspicious answers Officer Wilson received to his questions only intensified the reasonableness of this suspicion.

Because Officer Wilson had reasonable suspicion, he was permitted to continue to "ask investigatory questions," as long as the "scope of the detention" remained "carefully tailored to its underlying justification." *Skinner*, 969 F.3d at 938. The duration of the interaction is important because a *Terry* stop may become unconstitutional the longer it takes. *See Lambert*, 98 F.3d at 1189 n.11; *Dunaway v. New York*, 442 U.S. 200, 210–11 (1979) (justifying the existence of *Terry* stops by noting that they "usually consume[] less than a minute and involve[] a brief

question or two"). Indeed, although rejecting a bright-line temporal rule, the Supreme Court has observed that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Sharpe*, 470 U.S. 675, 685 (9th Cir. 1985). Relevant to this analysis, is whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686. This is where Officer Wilson's actions become problematic.

We know, based on the reports filed in this matter, that Officer Wilson's encounter with Porche lasted from about 12:18 to 12:48. (Docs. 17-1; 17-2.) Once Officer Wilson cut Gardner loose and returned his attention towards Porche, he testified he was not *diligently* pursuing an investigation into whether Porche was involved in illegal activity. On the contrary, Officer Wilson spent the majority of this time following Porche around his vehicle, casually chatting with him about subjects already covered—where he was from, why he was in town, how long he had been in town. Considerable time had already been expended on these inquires and Officer Wilson admitted he was not learning much and would have let Porche go if he had demanded return of his driver's license. Indeed, Officer Wilson testified he was planning to keep Porche there and ask him questions for as long as

Porche was willing to stay.  To put it simply, this was not a diligent investigation aimed at quickly confirming or dispelling Officer Wilson's suspicions, *Sharpe*, 470 U.S. at 686, and seems closer to a fishing expedition.  At this point, Officer Wilson suddenly decided he wanted to pat Porche down.

Before addressing the lawfulness of Officer Wilson's decision to pat Porche down, the Court holds that at this point, the investigatory stop had become constitutionally unreasonable due to its undue length and the torpidness of Officer Wilson's investigation.  This renders what comes next—mainly, Officer Wilson's discovery of the firearm on Porche's person—the fruit of an illegal detention.  Suppression is warranted on this basis alone.  *See United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019).  Nonetheless, the Court finds it necessary to explain why Officer Wilson's decision to pat Porche down was also unlawful.

### IV. Officer Wilson Lacked the Reasonable Suspicion that Porche was Armed and Dangerous Necessary to Perform a *Terry* Pat Down.

A lawful *Terry* frisk "does not always flow" from a lawful *Terry* stop. *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016).  As recognized by the Supreme Court in *Terry*, frisking an individual "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 17 (1968).  In order to perform a *Terry* pat down, law enforcement must have reasonable suspicion that the person being subjected to the *Terry* stop is "armed

17

and presently dangerous to the officer or to others." *Thomas*, 818 F.3d at 876.

This requires Officer Wilson to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably," establishing Porche may have been armed and dangerous at the time the frisk was initiated. *Id.* Critical to this case, an officer's belief that an individual would be dangerous *if* armed is insufficient to satisfy this standard. *United States v. Flatter*, 456 F.3d 1154, 1157–58 (9th Cir. 2006). This is precisely what Officer Wilson offers in this case.

At the hearing, Officer Wilson testified he had no articulable basis for concluding Porche was armed and dangerous. Porche had been cooperative and calm throughout the interaction and nothing in the record establishes he observed any bulge in Porche's clothing. In fact, it appears Officer Wilson only decided to pat Porche down because he was about to ask some confrontational questions and was concerned for his safety that if things went south, and it turned out Porche was armed. The Ninth Circuit has specifically held this is an insufficient justification for a *Terry* frisk. *Id.* (holding that when officers had no basis for believing an individual was armed, a *Terry* pat down was not justified simply because they were in a small space and "questioning was likely to become confrontational"). Put another way, Officer Wilson's decision to pat down Porche was unconstitutional.

This Court must admit this case is somewhat factually unique, because

although Officer Wilson expressed his intent to pat Porche down twice, such a pat down did not occur until the gun had already been discovered. That is, in response to Officer Wilson's statements to Porche that he was going to be patted down, but before actually being patted down, Porche pulled away and then admitted to Officer Wilson that he had a firearm on his person. The Court does not find this fact constitutionally significant in this case. Officer Wilson testified he made clear to Porche he was not leaving without being patted down. And Officer Wilson only learned about the gun because he put into motion an unconstitutional *Terry* pat down. In other words, the revelation that Porche had a firearm on his person cannot be separated from Officer Wilson's decision to unlawfully pat him down. Because of this, the firearm will be suppressed. *See United States v. Gallinger*, 227 F. Supp. 3d 1163, 1171–73 (D. Idaho 2017).

## ORDER

In some ways this is a close case. It is not easy to determine exactly when the encounter between Officer Wilson and Porche moved from a consensual encounter to a *Terry* stop requiring reasonable suspicion. But the Court concludes that at least some point before Officer Wilson sought to pat Porche down, the encounter had ripened into a formal investigatory stop. And for awhile there was reasonable suspicion to justify this investigatory stop, but its protracted and repetitive nature eventually rendered it constitutionally unreasonable. What is not

close, however, is the Court's determination that when Officer Wilson decided to pat Porche down, he did not have reasonable suspicion that Porche was either armed or dangerous. As such, suppression is proper.

Accordingly, IT IS ORDERED that Porche's suppression motion (Doc. 16) is GRANTED.

IT IS FURTHER ORDERED that all evidence procured by virtue of Officer Wilson's unconstitutional *Terry* stop and pat down is SUPRESSED, consistent with this Order. This includes the firearm found on Porche's person.

IT IS FURTHER ORDERED the United States shall file a notice on or before July 29, 2022, regarding its intent to proceed to trial, dismiss the Indictment, or pursue an appeal, so that this Court determine whether it needs to issue a new scheduling order in conformance with the Speedy Trial Act.

DATED this 21st day of July, 2022.

_____
Dana L. Christensen, District Judge
United States District Court